## BOROUGH OF RINGWOOD
v.
## UNITED STATES.
Cong. No. 8–58.

United States Court of Claims.
April 7, 1961.

Louis Wallisch, Jr., Passaic, N. J., Wallisch & Wallisch, Passaic, N. J., and Aaron Dines, Morristown, N. J., on the brief, for plaintiff.

Herbert Pittle, Washington, D. C., with whom was J. Edward Williams, Acting Asst. Atty. Gen., for defendant.

MADDEN, Judge.

This is a congressional reference case, which is before us pursuant to the provisions of 28 U.S.C. §§ 1492 and 2509. The plaintiff is a municipal corporation in the County of Passaic, in New Jersey. In 1957, a bill, H.R. 9392, 85th Cong., 1st Sess., was introduced in the House of Representatives proposing to pay to the plaintiff borough $146,133.08 because of certain taxes which the Borough claimed that the United States should have paid to the Borough. On July 21, 1958, the House of Representatives passed House Resolution 600, 85th Cong., 2d Sess., referring the pending bill to this court, as the House was authorized to do by the Code sections cited above. Our task is to inform the House as to the nature and character of the Borough's claim and the amount, if any, legally or equitably due from the United States to the Borough.

The facts of the case are not disputed. They were found by a commissioner of this court, after a trial, and we have adopted the commissioner's findings without significant alterations.

In and long before the year 1942 there was in the Borough of Ringwood a property of some 900 acres known as the Ringwood Iron Mines. It contained two known ore deposits, 65 buildings for the operation of the mines and 97 houses for mine workers. In 1942 the Defense Plant Corporation (DPC), a subsidiary of the Reconstruction Finance Corporation (RFC), both of which corporations were wholly owned by the United States,

bought the property. The DPC rehabilitated the property and operated it for war production purposes until about 1950. RFC paid the taxes assessed by the plaintiff during the years 1942–1950 as it was required to do by section 607 of Title 15 of the U.S.C.A.

In 1950 the property in question was declared surplus and was transferred by RFC and DPC to the United States. In 1951 the United States transferred the property to Ringwood Iron Mines, Inc., a private corporation. The sale price was $1,500,000. The purchaser paid $100,000 cash and gave a mortgage back to the United States to secure its note payable in annual installments, with interest. The purchaser corporation was not successful. It made only one partial payment of its annual installments to the United States. The Borough, of course, assessed the taxes on the property to the purchaser, and the purchaser paid them for the years 1951, 1952 and part of 1953. It failed to pay the taxes for a part of the year 1953 and for the years 1954–1957. Those unpaid taxes amounted to $146,-133.08, the amount in question in this proceeding.

As to the annual installments owed by the purchaser to the United States on its mortgage note, the United States was lenient, hoping that the purchaser would obtain new financing and get the enterprise on a paying basis. Finally, however, the purchaser gave notice that it could not carry on, and the United States foreclosed its mortgage. The United States District Court for the District of New Jersey held that the mortgage lien of the United States was superior to the tax lien of the plaintiff Borough. United States v. Ringwood Iron Mines, Inc., 151 F.Supp. 421. This decision was affirmed by the United States Court of Appeals for the Third Circuit. 251 F.2d 145. The Supreme Court of the United States denied certiorari on June 2, 1958. 356 U.S. 974, 78 S.Ct. 1138, 2 L.Ed.2d 1148.

The United States on December 4, 1956, bid in the property at the foreclosure sale for the amount remaining due on its mortgage note, with accrued interest. That amount was $1,685,367.43. In December 1958, the United States sold the property to the Pittsburgh Pacific Company for $650,000.

Congress recognized that when RFC, which paid taxes on the property which it owned, transferred property to the United States, whose property was not subject to state and local taxes, a hardship was imposed upon municipal taxing bodies. By the Act of August 12, 1955, 69 Stat. 722, Congress added the following provision to the Act of June 30, 1949, 40 U.S.C. (1952 ed., Supp. IV) § 523:

"Where real property has been transferred on or after January 1, 1946, from the Reconstruction Finance Corporation to any Government department, and the title to such real property has been held by the United States *continuously* since such transfer, then on each date occurring on or after January 1, 1955, and prior to January 1, 1959, on which real property taxes levied by any State or local taxing authority with respect to any period become due, the Government department which has custody and control of such real property shall pay to the appropriate State and local taxing authorities an amount equal to the amount of the real property tax which would be payable to each such State or local taxing authority on such date if legal title to such real property had been held by a private citizen on such date and during all periods to which such date relates." (Emphasis supplied.)

The plaintiff relies upon the quoted statute. The reliance seems to be misplaced. In any event, the statute would not apply to any taxes due before January 1, 1955, and hence would not cover the part of the plaintiff's claim which relates to taxes for 1953 and 1954. But the statute also requires that the property be held *continuously* by the United States, after it acquires it from the RFC,

until the tax date in 1955 or thereafter. In the instant case the RFC transferred the property to the United States in 1950, but the United States transferred the property to Ringwood Iron Mines, Inc., a private purchaser, in 1951.

The plaintiff has an answer to the problem posed by the word "continuously." It says that when the United States made its deed to the private purchaser in 1951 it took back a mortgage upon the property sold, and thereby continued to keep the "title" to the property.

■■ Early common law regarded a mortgage as placing legal title in the mortgagee subject to a conditional estate in the mortgagor which would shift the title to him upon the strict performance of the condition, viz., the payment of the debt on the due date. That concept of a mortgage is not accepted in New Jersey. East Rutherford Sav., Loan & Bldg. Ass'n v. Neblo, 101 N.J.Eq. 561, 139 A. 172. When the United States in 1951 made its deed to Ringwood Iron Mines, Inc., it parted with its "title" to the property in every significant sense. It ceased to be the equitable owner of the property. If by reason of inflation or new discoveries of ore the property had greatly increased in value, the United States would have had no right to share in that increase. It likewise had no legal title. It had no right to possession of the property and its entry on it would have been a trespass, unless permitted by some term of its mortgage. The United States had nothing but a lien to secure the payment of the promised purchase price. It had no more title, legal or equitable, than a banker would have had if he had loaned the purchaser the money to pay for the property, and had taken a mortgage on the property to secure the loan. The statute relied on by the plaintiff is not applicable, either in letter or in spirit.

Most of the evidence taken in the case, and many of our findings, have to do with the unfortunate consequences of the failure of the successor owner of the property to operate it profitably. We are not advised whether that failure was due to bad management, or to the conditions of the market for its products, or to some other reason. It was not due to any fault or omission of the United States. The United States had acquired the property for production for war purposes. In 1950 it had no further use for the property. Obviously, the prudent thing to do was to sell it, if it could find a purchaser. It would be remarkable if it could not do so without undertaking to guarantee that its purchaser would, for the indefinite future, pay his taxes, maintain the property so that it would justify a high assessment for tax purposes, give continuous employment to the inhabitants of the area and, in general, be a valuable asset to the community.

We suppose that many taxing bodies throughout the United States have suffered adverse effects from the closing down of war-time operations which had been carried on by the United States or by private enterprises. Perhaps the plaintiff Borough's situation is unusual in that the single enterprise here involved was so relatively large and important a taxpayer, in the plaintiff's small community. That difference in degree, but not in kind, from other adversely affected communities could hardly be a sound foundation for a legal or equitable claim against the United States.

We respectfully report to the Congress that, in our opinion, the Borough of Ringwood has no valid claim, legal or equitable, against the United States.

The Clerk will certify to the Congress pursuant to H.Res. 600, 85th Cong., 2d Sess., this opinion together with the findings which follow.

It is so ordered.

REED, Justice (Retired), sitting by designation, JONES, Chief Judge, and DURFEE and LARAMORE, Judges, concur.